1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

----------------------------x

4

UNITED STATES OF AMERICA      :   DOCKET NUMBER CR-08-10036

5

          versus              :   UNITED STATES COURTHOUSE

6

WINSTON McGHEE                :   BOSTON, MASSACHUSETTS

7

----------------------------x

8

9                   NOVEMBER 18, 2008

10

11                    10:00 a.m.

12            TRANSCRIPT OF SENTENCING HEARING

13

BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

14         UNITED STATES DISTRICT JUDGE

15

16

17

18              **OFFICIAL COURT REPORTER**

19

20    **DIANE M. MOLAS, RPR, DE CSR, AND NJ CCR**
          **OFFICIAL COURT REPORTER**
      **UNITED STATES DISTRICT COURT - DISTRICT OF MASSACHUSETTS**
21               **ONE COURTHOUSE WAY**
          **THIRD FLOOR - COURTROOM 1 - SUITE 3200**
22                **BOSTON, MA 02210**
            **TELEPHONE: (267) 977-2909**
23            **E-MAIL:  Dmolas1@aol.com**

24

      PROCEEDINGS REPORTED USING MACHINE STENOGRAPHY.
25    TRANSCRIPT PRODUCED EMPLOYING COMPUTER-AIDED TECHNOLOGY.

1   APPEARANCES:

2       ATTORNEY FOR THE UNITED STATES OF AMERICA:

3           MICHAEL J. SULLIVAN, ESQUIRE
            UNITED STATES ATTORNEY
4           UNITED STATES DEPARTMENT OF JUSTICE
            UNITED STATES ATTORNEY'S OFFICE
5           DISTRICT OF MASSACHUSETTS
            ONE COURTHOUSE WAY
6           SUITE 9200
            BOSTON, MA 02210
7           TELEPHONE: (617) 748-3800
            E-MAIL:  Timothy.e.moran@usdoj.gov
8
                BY:  TIMOTHY MORAN, ESQUIRE
9                    ASSISTANT UNITED STATES ATTORNEY

10
        ATTORNEY FOR THE DEFENDANT, WINSTON McGHEE:
11
            FEDERAL PUBLIC DEFENDER OFFICE, MASSACHUSETTS
12          408 ATLANTIC AVENUE
            THIRD FLOOR
13          BOSTON, MA 02210
            TELEPHONE: (617) 223-8061
14          E-MAIL:  syrie_fried@fd.org
            FAX:  (617)223-8080
15
                BY:  SYRIE FRIED, ESQUIRE
16                   ASSISTANT FEDERAL DEFENDER

17
            ALSO PRESENT:  LISA PAIVA
18                         U. S. PROBATION OFFICER

19
    **OFFICIAL COURT REPORTER:**
20
            **DIANE M. MOLAS, RPR, DE CSR, and NJ CCR**
21          **OFFICIAL COURT REPORTER**
            **UNITED STATES DISTRICT COURT - DISTRICT OF MASSACHUSETTS**
22          **ONE COURTHOUSE WAY**
            **THIRD FLOOR - COURTROOM 1 - SUITE 3200**
23          **BOSTON, MA 02210**
            **TELEPHONE: (267) 977-2909**
24          **E-MAIL:  Dmolas1@aol.com**

25                          -  -  -

1                       P R O C E E D I N G S

2                          SENTENCING HEARING

3              THE DEPUTY CLERK:  This Honorable Court is now in

4    session.

5              You may be seated.

6              Calling the case, CV 08-10036, United States versus

7    Winston McGhee.

8              THE COURT:  Well, I received the Supplemental

9    Memorandum from the Government, suggesting there's an

10   alternative way of calculating the Career Guidelines without

11   putting in play the problematic Guideline having to do with

12   characterization of Youthful Offender conviction, as an Adult

13   conviction under Massachusetts law, and citing towards shortly

14   after the Government filed the Supplemental Memorandum, the

15   Court of Appeals issued the mandate, following denial of

16   en banc consideration, so Torres is governing here.

17             I guess the question I have is:  Is there any

18   reason why Torres doesn't direct that the Career Offender

19   Guideline applies?

20             MS. FRIED:  Was that addressed to me, Your Honor?

21             THE COURT:  Yes.

22             MS. FRIED:  I believe there is, if I can be heard

23   on that.

24             I will admit that, on its face, Torres looks like

25   one thing, but, if you read it closely, Your Honor, it really

1   is not dispositive of this issue, at all, given where we are

2   and the facts of this case, and there are a couple things I

3   want to point out about Torres.

4              First of all, Torres, in fact, the First Circuit

5   appeared to take the position that Torres did, in fact,

6   involve an Adult conviction, as opposed to a Juvenile one, and

7   where I would point The Court to is, if The Court has the

8   opinion in front of you.

9              THE COURT:  I do.

10             MS. FRIED:  After it says:  Part 2 discussion,

11  A) Standard of Review, and, then, B) whether Torres' 1996

12  convictions may count, if The Court goes -- if you go to the

13  end of that first paragraph, after Subpart B, the last

14  sentence of it is:  The Government counters that, even though

15  Torres was a minor when he committed the offenses, he was

16  convicted and sentenced at Age 20 and treated by the

17  New Jersey court as an Adult, so the offense is counted.

18             THE COURT:  No.  The Government says the offense is

19  counted.

20             MS. FRIED:  Well --

21             THE COURT:  No, just a moment.

22             MS. FRIED:  Oh, I'm sorry.

23             THE COURT:  And the very next sentence is:  Under

24  the circumstances, we need not delve into New Jersey law or

25  how New Jersey law, the New Jersey court, classified Torres

1    thereunder.

2            MS. FRIED:  May I continue, though?

3            Of -- I just want to talk about what I think is an

4    important factual distinction between the facts on the ground

5    in Torres and the facts in this case, and, of course, I don't

6    have the record, the factual record in Torres, but it appears

7    that the First Circuit took the view, in deciding Torres,

8    that, in fact, it appears that they took the Government's

9    view, which was that it was treated as an Adult conviction,

10   okay?

11           And, so, therefore, you came comfortably within

12   4B1.2's description, that a prior felony conviction has to be

13   an Adult conviction, and let me continue on, because it's

14   important.

15           THE COURT:  Why this wasn't reduced to writing, I

16   don't know, but you'll, perhaps, tell me sometime.

17           MS. FRIED:  Yeah.

18           To continue on, has The Court looked at the cases

19   that were cited within Torres, within the Torres opinion

20   itself?

21           THE COURT:  Yes.

22           MS. FRIED:  Okay.

23           There's one -- I want to make a few observations

24   about those cases.

25           In each one of the cases that the First Circuit

1    relied upon in <u>Torres</u> -- and the cases I'm referring to are

2    the Third Circuit case, <u>United States versus Morar (phonetic)</u>,

3    the Fourth Circuit case, <u>United States versus Mason</u>.

4              THE COURT:  You mean the CEG cites?

5              MS. FRIED:  Yes.

6              THE COURT:  Please, we're talking about the

7    First Circuit.

8              MS. FRIED:  No, but I want to explain something.

9    I'm trying to make an explanation about why I don't think

10   <u>Torres</u> is the answer to this discussion.

11             In the cases that <u>Torres</u> cites, which are

12   <u>Morar (phonetic)</u>,  <u>Mason</u>, <u>Rudolph Heinz</u> (phonetic) case, which

13   is an unpublished opinion from the Sixth Circuit, and the

14   <u>Bacon</u> case, which is another Fourth Circuit case, all of those

15   four cases involved underlying convictions that were -- where

16   it was the question of whether they could count as Career

17   Offender predicates, those were all Adult cases.

18             There was never any contention made by the

19   defendant in any of those cases that they were not Adult

20   cases, which is different from, of course, the posture of this

21   case, where the Government's saying that this Youthful

22   Offender conviction needs to be treated as an Adult case, in

23   order to qualify.

24             THE COURT:  This is all immaterial.

25             Footnote 3 says that:  Because we find an

1    alternative ground for a furtherance, we need not state a view

2    on whether the District Court was correct in characterizing

3    these as Adult convictions, so the short of this is, all of

4    this factual distinction has nothing to do with this case.

5              It has to do with whether or not there is an

6    alternative basis for finding that the defendant here is a

7    Career Criminal.

8              MS. FRIED:  I would disagree only because I think

9    what the court says here -- says in Torres, on this question,

10   is dictum.

11             I do believe it's dictum because, in fact, in

12   Torres --

13             THE COURT:  What's dictum?

14             MS. FRIED:  Okay.

15             I'll tell you what I think is dictum in Torres.

16             Going, approximately, to the end of that page,

17   where I directed The Court to the language and The Court

18   followed with the, under the circumstances, and The Court goes

19   on to say, in Torres:  For these reasons, it is immaterial

20   whether Torres was classified as an Adult under New Jersey law

21   or whether, at the relevant time, he committed these crimes he

22   was -- okay.

23             So I believe -- I would argue that, when

24   This Court, when the First Circuit was deciding Torres, that

25   language is dictum because, in fact, he had been sentenced as

1    an Adult, and what I believe a close reading of the cases of

2    Torres and the cases on which Torres relies shows is that,

3    what the defendant Torres was trying to do in the

4    First Circuit was to invoke this application Note 7, under

5    4A1.2, which creates this Rule of Lenity about when certain

6    convictions might not be counted for offenses that were

7    committed before the Age of 18.

8            The problem that I see in Torres and why I think

9    this is really all dictum when it comes to trying to apply

10   Torres to this case, is that it appears that the First Circuit

11   in Torres is misreading Application Note 7 of 481.2 and

12   turning that application from a Rule of Lenity, which it was

13   designed to be, into a Rule of Enhancement; in fact, it's

14   turning it exactly into something opposite of what it was.

15           THE COURT:  Well, that's an argument, I think, that

16   you'll have an opportunity to address to the First Circuit,

17   that they're misreading the cases, but I'm dealing with what

18   the First Circuit says.

19           MS. FRIED:  I understand that, Your Honor, but the

20   reason why I'm trying to contend that Torres ought to be

21   discounted, in attempting to apply it to this case is that, in

22   fact, in Torres, they were dealing with an Adult conviction.

23           THE COURT:  Okay.

24           Is there anything else?

25           And, again, you'll explain to me why this wasn't,

1  this very interesting argument wasn't reduced to writing and

2  provided before this hearing.

3          MS. FRIED:  Well, Your Honor, I frankly didn't

4  think that, given how difficult it was for me to develop this

5  argument and how much reading and thinking I was doing to

6  develop this argument, I frankly thought I was better off

7  presenting it orally.

8          THE COURT:  You mean so that I didn't have a chance

9  to review it and think about it ahead of time?

10         MS. FRIED:  No.  No.

11         That's not my motive, at all.

12         THE COURT:  What other explanation, that it was

13  very hard and it's a very complex issue, and, consequently,

14  you didn't want to reduce it to writing and present it here in

15  court for the first time?

16         MS. FRIED:  It's not a matter of whether I didn't

17  want to reduce it to writing.

18         THE COURT:  Well, I asked:  Why wasn't it reduced

19  to writing?

20         MS. FRIED:  Well, for one thing, and The Court can

21  check the docket on this, yesterday, I finished writing a

22  seventeen-page Sentencing Memo in another case for a

23  sentencing that I have this afternoon at two o'clock before

24  Judge O'Toole in a very complex case, as well --

25         THE COURT:  We've been over this before.

1           MS. FRIED:  I know.

2           THE COURT:  That what happens is issues are raised,

3  this one is frivolous, but issues are raised and presented at

4  the time of the oral argument and not briefed before, requests

5  for a Continuance are not something that you're unfamiliar

6  with.

7           You make them with some frequency, and none remain

8  here.

9           MS. FRIED:  That's right.

10          THE COURT:  Okay.

11          So I guess my view is the First Circuit has

12  apparently ruled on this.

13          MS. FRIED:  Mm-hmm.

14          THE COURT:  Your suggestion that they're holding is

15  dictum and that they are misreading the cases is something, as

16  I said, you'll present, I'm sure, at the First Circuit, and

17  they will take it into consideration, whether or not they

18  misread their own case.

19          MS. FRIED:  I'm just saying that, when you apply it

20  to this case, that's correct.

21          THE COURT:  Well, when you apply it to this case,

22  Torres, you're saying that the holding of Torres is dictum,

23  when they have explicitly said that they are not ruling on the

24  question of whether these are properly characterized as Adult

25  convictions.

1          MS. FRIED:  Well, what I'm saying is -- what I'm

2     contending, Your Honor, is that that language is not the

3     holding, that's briefly what I'm contending, that that's not

4     the holding, that the outcome in Torres was dicted (sic) by

5     the fact that it was an Adult conviction, and, therefore, they

6     didn't need to get into it, and what they were not willing to

7     do was to engage in an analysis, the kind of analysis that was

8     engaged in in the Mason case by the Fourth Circuit, of whether

9     or not the Rule of Lenity made not countable this prior

10    conviction for a case for an offense committed before the

11    Age of 18, and that's what the Mason case is about.

12          Mason is --

13          THE COURT:  Okay.

14          I'm in the First Circuit.  I'm not in the

15    Fourth Circuit.

16          MS. FRIED:  Mm-hmm.

17          THE COURT:  I take the First Circuit generally at

18    its word.

19          If it says something, then, I follow it.

20          If it's improvident, they have other mechanisms for

21    finding that out, and making such adjustments as are

22    necessary, but there's no other argument, I take it, that you

23    wish to make, with respect to the --

24          MS. FRIED:  With Torres, with respect to Torres?

25          THE COURT:  Yes.

1              MS. FRIED:  Yeah.

2              There is one other observation, I would like to

3   make, with respect to Torres, and that is, leaving aside the

4   other things that I just said, about whether or not it really

5   says what it says, if The Court takes it at base value, I

6   would only say that it is a baffling decision, at best, and

7   that is because it is clear that, leaving aside the other

8   criticisms that I weighted and the other distinctions I tried

9   to draw and take it at face value, what Torres does is that it

10  says that we are going to allow Application Note 7, the 4A1.2,

11  override one of the prerequisites of applying the

12  Career Offender Guideline.

13             In other words, we're not -- we're simply not

14  interested at this point in whether or not the prior felony

15  conviction to be relied upon for applying 4B1.2 is an Adult

16  conviction, or not, that, instead, we're going to leapfrog and

17  not engage in that analysis and simply look at the question of

18  Recency of Incarceration.

19             THE COURT:  But that's what the note says.

20             MS. FRIED:  Well --

21             THE COURT:  I mean, it's just an alternative way of

22  calculating Career Offender.

23             MS. FRIED:  But it does so by removing one of the

24  prerequisites for applying the Guideline.

25             THE COURT:  Not entirely.

1              MS. FRIED:  I'm sorry?

2              THE COURT:  Not entirely.

3              It provides the exception.

4              It narrows one of the prerequisites.

5              It doesn't entirely remove it.

6              MS. FRIED:  Well, it removes it to the extent that

7    Torres suggests that you're not interested in looking at

8    whether or not it was treated as a -- whether or not the

9    prior, that sought to be made a predicate, is an Adult

10   conviction, or not.

11             Now, I see nothing in 4A1.2 which -- or in any of

12   the structure of the Guidelines which suggests that that

13   Guideline should take precedence over whether or not the

14   prerequisites for applying the Career Offender Guideline have

15   to be met.

16             THE COURT:  So your argument is that this language

17   in the Guideline is simply ineffective?

18             MS. FRIED:  Which Guideline are we talking about,

19   4B1.2?

20             THE COURT:  4A1.2(d).

21             MS. FRIED:  No.

22             I'm saying that 4A1.2(d) --

23             THE COURT:  Right.

24             MS. FRIED:  -- is a Rule of Lenity.

25             THE COURT:  Well, I mean, labeling the Rule of

1    Lenity doesn't advance the discussion, at all, in fact, it

2    seems to obfuscate it.

3         It has a rule that says:  If there is an offense

4    that's committed prior to Age 18, resulted in the imposition

5    of an Adult or Juvenile sentence, or released from confinement

6    on that sentence within five years of the defendant's

7    commencement of the instant offense, it's counted.

8         MS. FRIED:  Well, yes, but you have to go to the

9    title, of course, of the first Guideline, which is Definitions

10   and Instructions -- I'm sorry, Your Honor.  I'm nervous -- for

11   computing Criminal History, and it's criminal history, as

12   distinguished from -- criminal history broadly for application

13   of all Guidelines, as distinguished from computing whether or

14   not you can apply a specific Guideline that provides for an

15   extra enhancement; in this case, we're talking about 4B1.2,

16   and, of course, there's no logical inconsistency in having an

17   offense that might be a Juvenile offense be countable for

18   purposes of determining Criminal History, but not be countable

19   for purposes of determining whether or not a special

20   sentencing enhancement; like, Career Offender, applies; in

21   other words, what 4B -- 4A1.2(d) is designed to do is to

22   remove ambiguities, where you're talking about trying to

23   determine whether you count offenses that were committed

24   before a defendant turned 18, trying to remove ambiguities

25   about whether or not those count for general Criminal History

1    purposes, by laying down a rule that says -- well, what it

2    says.

3                    THE COURT:  So the First Circuit got that wrong,

4    too?

5                    MS. FRIED:  Well, yes.

6                    THE COURT:  What else?

7                    What else?

8                    MS. FRIED:  What I'm saying --

9                    THE COURT:  What else?

10                   MS. FRIED:  Well, that's -- that's -- that's what I

11   have to say on that question.

12                   THE COURT:  Alright; so let me understand:  Does

13   Probation have a view, with respect to this?

14                   MS. FRIED:  Could I be seated?

15                   THE COURT:  Yes.

16                   U. S. PROBATION OFFICER PAIVA:  Probation would

17   defer to The Court to resolve --

18                   THE COURT:  You haven't addressed this issue in any

19   other context?

20                   U. S. PROBATION OFFICER PAIVA:  No, we haven't,

21   Your Honor.

22                   THE COURT:  Okay.

23                   U. S. PROBATION OFFICER PAIVA:  No.

24                   This is the first.

25                   THE COURT:  So do you want to speak to the two

1    arguments?

2          Really, the first one, as I said, I think is

3    frivolous.

4          The second one is having to do with the structure

5    of the Guidelines.

6          MR. MORAN:  Your Honor, it's the Government's view

7    that the First Circuit's decision does not eviscerate any of

8    the Guidelines.

9          It does not set up a consistency between one

10   Guideline or the other.

11         The First Circuit merely makes clear that the

12   Career Offender Guideline provides for an alternative method

13   of reaching the issue whether a particular conviction is

14   applicable as a predicate offense.

15         It's still the case that, if the Recency of

16   Incarceration did not answer the question, it might be the

17   case that a court would have to reach the issue of whether,

18   under State law, the conviction was Adult or Juvenile, but, as

19   Torres makes clear, this case, in relation to Torres, we don't

20   have to reach that question in this case, because, under the

21   Guidelines, 4A1.2(d) provides an alternative method.

22         It's simply an alternative method of finding that

23   the Youthful Offender conviction is a predicate conviction.

24         I think Torres is very clear on it.

25         I think Torres is very similar to these facts.

1          I don't think Torres leaves -- I think Torres makes

2     it very clear.

3          I'm happy to answer any additional questions,

4     Your Honor, but --

5          THE COURT:  Well, my view is I'm guided by -- not

6     guided.  I'm directed by Torres, and we deal with an offense

7     that is countable on independent grounds from those which

8     captured my attention the last time we were here, which is

9     how, under Massachusetts law, a Youthful Offender conviction

10    is characterized, whether it's characterized as an Adult

11    conviction.

12         That is an issue, which, if it were determinative,

13    I think I would certify it, as I indicated to the parties,

14    despite their mutual reluctance to have it presented to the

15    Supreme Judicial Court, as reflected in their Supplemental

16    Memorandum, but there is a supervening alternative way of

17    reading this, that makes it unnecessary for me to reach the

18    question of characterization and seek the assistance of the

19    Supreme Judicial Court, and that's the one provided by Torres.

20         I refuse to read Torres' holding as dicta; that is,

21    I think, as I've indicated, a frivolous argument.

22         With respect to the structure of the Guidelines, as

23    if the titles were hermetically sealed conceptual constructs,

24    I disagree with that, as well.

25         In point of fact, Application Note Number 2 to

1  | 4B1.3 --

2  |           MS. FRIED:  I'm sorry, 4B1 point?

3  |           THE COURT:  4B1.3 makes clear that there is a cross

4  | reference to the Career Offender Guidelines.

5  |           MS. FRIED:  I'm sorry.

6  |           Application Note 4B1.3?

7  |           THE COURT:  .32.

8  |           2 and 3, I should say.

9  |           MS. FRIED:  I'm sorry.

10 |           I'm looking at 4B1.3 --

11 |           THE COURT:  I'm sorry.

12 |           4B1.2.

13 |           MS. FRIED:  Application Note 3?

14 |           THE COURT:  2 and 3.

15 |           (Pause.)

16 |           THE COURT:  Made clear that these are reticulated

17 | Guidelines, designed to provide a seamless method of making

18 | these calculations, and the calculations for purposes of

19 | Career Guidelines or -- Career Offender Guidelines, are

20 | dictated by 4A1.2(d), as Torres says.

21 |           So the short of it is:  I do find that there is an

22 | alternative mechanism for reaching the goal that the

23 | Government sought here, of characterizing the defendant as a

24 | Career Offender under the Guidelines.

25 |           The effect of that, I believe, is that the

1   Guideline range or the Guideline itself is Level 32, and that

2   the Criminal History Category is characterized as 6, and, so,

3   the Presentence Report has to be modified to reflect that on

4   the basis of Torres and this rule.

5           MS. FRIED:  Please note my objection.

6           THE COURT:  Yes.

7           It goes without saying.

8           MS. FRIED:  Thank you.

9           THE COURT:  So, now, we deal with a Guideline range

10  of 210 to 262 months in prison, I believe, and the -- I guess

11  I'm going to need some assistance on the Supervised Release

12  range here.

13          Does that change?

14          U. S. PROBATION OFFICER PAIVA:  It's still three

15  years, and the fine would be 17,500 to 1 million five range.

16          THE COURT:  17,500?

17          U. S. PROBATION OFFICER PAIVA:  Yes.

18          THE COURT:  Rather than 12,500?

19          U. S. PROBATION OFFICER PAIVA:  Correct.

20          THE COURT:  Okay.

21          And the Special Assessments are $200?

22          U. S. PROBATION OFFICER PAIVA:  Correct.

23          THE COURT:  Alright.

24          Now, having made the rulings that I've made, of

25  course, suggest to objection, is there any dispute that that's

 1    the calculation here?

 2              MR. MORAN:  Not from the Government, Your Honor.

 3              THE COURT:  And the Guideline calculation?

 4              MS. FRIED:  Could I just?

 5              (Ms. Fried conferred with the defendant.)

 6              MS. FRIED:  Your Honor, I'm -- I don't have

 7    anything to add.

 8              THE COURT:  Okay.  I take that as there is no

 9    dispute, that the calculation is proper.

10              So, now, I think that leads us to the question of

11    recommendations.

12              I don't think there is anything else left to be

13    resolved here.

14              So what's the Government's recommendation?

15              MR. MORAN:  Thank you, Your Honor.

16              Now, the Government requests a Guideline

17    Sentence -- excuse me.

18              The Government laid out its reasoning in its

19    original Sentencing Memorandum.

20              I would like to highlight a few points, if I may.

21              THE COURT:  Alright.

22              MR. MORAN:  First to address the nature of the

23    offense, and the Government realizes that this is a -- a large

24    sentence.

25              THE COURT:  It's a large sentence for what is

1  essentially a small State case.

2          MR. MORAN:  That's true, Your Honor, and the

3  Government adopted this case with the view from the time when

4  it superceded -- from the time when it brought the case again,

5  after it having been -- if I may touch on a procedural issue

6  for a moment, the case was dismissed, as you may recall, under

7  a violation of the Interstate Agreement and Detainers, the

8  Government refiled the case and, then, superceded to add the

9  Possession With Intent to Distribute charge, which, obviously,

10  is the trigger for the application of the Career Offender

11  Guidelines.

12          From that -- at that point, from having superceded,

13  the Government was of the view that he was a Career Offender,

14  and the Government intended to make that Guideline applicable,

15  and we realize that it is a large sentence for, what appears

16  to be, for what may appear, at first glance, to be a less

17  significant case.

18          It's the Government's view that the case --

19          THE COURT:  Let's put it a different way:  But for

20  the fact of the desire to reach Career Offender, with respect

21  to Mr. McGhee, would a case like this ever make it into the

22  U. S. Attorney's office profile?

23          If it came up off the street and we were dealing

24  with -- or out of Nantucket, and we were dealing with --

25  Martha's Vineyard, I guess it is -- and we were dealing with

1    this kind of transaction, would it ever be prosecuted in the

2    federal court?

3              MR. MORAN:  If it were not this defendant, no,

4    Your Honor, you're correct.

5              THE COURT:  So it has to do with this defendant?

6              MR. MORAN:  Yes.

7              THE COURT:  That's what is the Government's grounds

8    for pursuing this case, which is within its scope to do, but

9    effects my judgment, with respect to what the sentence should

10   be.

11             MR. MORAN:  You're correct, Your Honor.

12             The reason this case is in federal court,

13   regardless of whether or not the Career Offender Guideline

14   would have applied, and, when the case was first brought

15   under -- we still brought this case against this defendant

16   before we even had a Career Offender trigger, the reason this

17   case is here is because the Government views this defendant as

18   very dangerous, and that's why we want a long sentence.

19             His Criminal History reveals that he engaged in

20   violent offenses from a very young age.

21             The Armed Robbery, which is the -- one of the

22   predicate offenses, took place at Age 15, and it may be the

23   Defense's contention that he has suffered from a long history

24   of institutionalization.

25             I don't think that answers the question of this

1    defendant's dangerousness, because that Armed Robbery was the

2    first incident that triggered his lifetime of

3    institutionalization, so it cannot be that

4    institutionalization caused him to be violent.

5            The fact is, he was placed in institutions because

6    he was violent.

7            Those institutions were intended to ameliorate his

8    violent tendencies and encourage him to become a productive

9    member of society, and they did not succeed because of the

10   choices that this defendant made.

11           I had the opportunity to take a look at his DUIS

12   history, which is sealed and cannot be filed in court, but

13   Probation had a copy of it, and I was able to take a look at

14   that, and what it reveals is that, on several occasions --

15           THE COURT:  Well, if it's something that I'm going

16   to be asked to rely on, then it has to be part of the record.

17           MR. MORAN:  Let me address, then, what's in the

18   PSR, Your Honor, because I think I can make the same points

19   with regard to those facts, which are in the record.

20           On several occasions, he was returned --

21           THE COURT:  Let me go back to that question of DUIS

22   records.

23           Why aren't they available for introduction?

24           MR. MORAN:  It's my understanding that those are

25   sealed and they can't be filed in court, and that's why --

1          THE COURT:  Says who?

2          MR. MORAN:  I can't recall whether I learned that

3     from having discussed it from a colleague --

4          THE COURT:  Well, is that a State law issue, under

5     State law, DUIS records aren't available, and, if so, what's

6     the application of Article 6 of the Federal Constitution?

7          MR. MORAN:  I had not considered that, Your Honor,

8     before.

9          THE COURT:  Just a moment.  I just want to hear

10    from Probation.

11          What happens with DUIS records?

12          You get them and use them in connection with the

13    Presentence Report?

14          U. S. PROBATION OFFICER PAIVA:  Yes.

15          We request the records with an order that's signed

16    by Your Honor.

17          THE COURT:  Right.

18          U. S. PROBATION OFFICER PAIVA:  DUIS provides us

19    with the records, we review them, and, then, summarize the

20    pertinent information into the Presentence Report.

21          I'm not aware of any specific law or rule that

22    prohibits them from being introduced in court.

23          THE COURT:  Nor am I.

24          It may be that that's the practice in the

25    State court, but, as is evident on a number of different

1     levels, this isn't the State court anymore.

2          MR. MORAN:  I apologize, Your Honor.

3          It appears I was misinformed.

4          THE COURT:  Yes?

5          MS. FRIED:  Your Honor, what I was only going to

6     say, perhaps it's not even germane, was that Mr. McGhee signed

7     a number of Releases, during the course of preparing for this

8     Presentence Report, and there may have been -- I imagine there

9     were limits on the amount of disclosure he was authorizing; in

10    other words, he signed Releases to authorize Probation to

11    receive certain materials, but without any further -- but

12    without any proviso that they were going to be made part of

13    court filings.

14          Now, maybe that doesn't play into it, but I'm sure

15    that was our understanding when he signed the Releases.

16          THE COURT:  Are there Releases, and do the Releases

17    have limitations on them?

18          U. S. PROBATION OFFICER PAIVA:  They do not have

19    limitations, that I'm aware of.

20          What the Probation Office does with them is just

21    review and extracts the pertinent information.

22          THE COURT:  But does the defendant file a Release,

23    with respect to DUIS records, with Probation?

24          U. S. PROBATION OFFICER PAIVA:  Yes.

25          THE COURT:  And what does that Release say?

1              U. S. PROBATION OFFICER PAIVA:  It's a standard

2    Release that I do --

3              THE COURT:  Do you have a copy of the one here --

4              U. S. PROBATION OFFICER PAIVA:  I do.

5              THE COURT:  -- that would be applicable?

6              (Pause.)

7              U. S. PROBATION OFFICER PAIVA:  Just give me a

8    minute, Your Honor.

9              THE COURT:  Sure.

10             (Pause.)

11             (Handed to the Clerk.)

12             U. S. PROBATION OFFICER PAIVA:  That's the Release

13   that we use for any State agency.

14             (Handed to The Court.)

15             THE COURT:  Okay.

16             U. S. PROBATION OFFICER PAIVA:  I can look a little

17   further to find the actual request.

18             THE COURT:  You mean the formal order of request

19   that I sign?

20             U. S. PROBATION OFFICER PAIVA:  Yes.

21             THE COURT:  I don't recall any.

22             U. S. PROBATION OFFICER PAIVA:  DUIS actually,

23   doesn't require the Release from the defendant.

24             THE COURT:  Just the court order?

25             U. S. PROBATION OFFICER PAIVA:  Just the court

1  order.

2          THE COURT:  Well, the Release here, the

3  authorization here, that's signed by Mr. McGhee, says:  I

4  understand that information used or disclosed, pursuant to

5  this authorization, may be disclosed by the recipient and may

6  no longer be protected by federal or State law; which is the

7  waiver of that, any protections he has.

8          So, to the degree that you want to make use of

9  that, you may here; that is, DUIS records, but they become a

10 part of the record that may be confronted by the defendant.

11         MR. MORAN:  I think I can make argument on the

12 basis of what's also in the PSR.

13         If I can direct your --

14         THE COURT:  Well, what's in the PSR is derived from

15 the DUIS records.

16         It's simply a summary, I think it's fair to say, of

17 the DUIS records.

18         I'm going to pass back, because it's part of the

19 Probation file, the Release that was signed by the defendant.

20         (Handed to the Probation Officer.)

21         MR. MORAN:  In Paragraph 69, it notes, of the PSR,

22 it notes that, between September 3, 2000 and March 24, 2005,

23 which was his twenty-first birthday, the defendant was placed

24 at home on three occasions, and, on each occasion, the

25 defendant was returned to custody for parole violations, and

1    my point on that, Your Honor, is that he had opportunities to

2    stay at home with his parents.

3                    THE COURT:  Okay.

4                    What are the parole violations?

5                    (Pause.)

6                    MR. MORAN:  Referring to his Criminal History, on

7    October 31, 2001, he was arraigned on a Trespassing charge.

8                    On January 21, 2002, he was arrested for Assault

9    and Battery With a Dangerous Weapon.

10                   MS. FRIED:  I'm sorry.

11                   What was that date?

12                   MR. MORAN:  On January 21, 2002, he was arrested on

13   Assault and Battery With a Dangerous Weapon.

14                   I think those may match up, Your Honor.

15                   THE COURT:  Well, when you say they, "may match

16   up" --

17                   MR. MORAN:  I know that one of the home visits,

18   home stays, ended October 30, 2001, and October 31 was when he

19   was arraigned, as I said, on the Trespassing charge.

20                   I think -- and, then, another home stay went from

21   November 1, 2001, to January 23, 2002, and, then, January 21,

22   2002, he was arrested for Assault and Battery With a Dangerous

23   Weapon.

24                   That's Paragraph 45 of the PSR, Your Honor.

25                   THE COURT:  45 and 46.

1                    MR. MORAN:  Yes, Your Honor.

2                    THE COURT:  Those are the two parole violations,

3    you say?

4                    MR. MORAN:  Yes, Your Honor.

5                    THE COURT:  They're called probation violations --

6                    (Pause.)

7                    THE COURT:  -- in the PSR.

8                    MR. MORAN:  Yes, Your Honor.

9              I would have to -- from putting the record

10   together, Your Honor, I think those are the -- those are -- my

11   point is that those are what resulted in the termination of

12   his placement at home, and my point, Your Honor, is that he

13   had opportunities to remain at home in a non-institutional

14   setting, and he was the one who chose to engage in criminal

15   activity, which led to those placements being rescinded.

16              These are all things that are happening by his

17   choice.

18              I'd also like to point to the facts of the -- that

19   first Armed Robbery, that took place, as I said, when he was

20   fifteen years old.

21              This is in Paragraph 42 of the PSR, on Pages 7 to

22   8.

23              They stopped the victim -- he and the codefendant

24   stopped -- stopped the victim on the street, held a gun to the

25   victim's head, and one of them stated, "Don't run.  Don't ever

1  run."

2          And the other robbed the victim of cash and

3  jewelry, and I, also, put in my Sentencing Memorandum the

4  grand jury testimony of the victim in that case.

5          His name is Freddie Smith, Jr., and that's -- this

6  is -- that is a serious Armed Robbery, involved a gun pointed

7  at someone's head.

8          It's not the kind of -- I think we're all familiar

9  with charges that may arise in the State courts that may

10  appear to be pretextural or trumped-up charges, whereby

11  someone who was charged with Assault and Battery With a Deadly

12  Weapon and may have had a knife in his pocket, for example,

13  something like that.

14          This is not that case.

15          This is a serious, serious, very dangerous

16  Armed Robbery With Assault with a Deadly Weapon, pointed at

17  the victim's head.

18          THE COURT:  Ten years ago.

19          MR. MORAN:  Ten years ago, Your Honor, but that was

20  his first interaction with the Criminal Justice System.

21          That was when he was fifteen, so he went straight

22  from 0 to 60, so to speak, and he hasn't let up ever since.

23          In and out of placement with serious crimes.

24          There were other predicate offenses, Assault and

25  Battery With a Deadly Weapon, and, finally, I want to point to

1  how this case was resolved.

2          He got out of jail on the -- when the pending case

3  was <u>nol-prossed</u> in 2006, I think in June of 2006.

4          And, less than one month later, he was arrested,

5  engaged in a conduct which formed this case, so he gets out of

6  jail, and it doesn't take him a month later to end up back in

7  jail.

8          That's the definition of serious recidivism, and

9  I'd also like to point to some of the facts of that case, as

10  they relate to his dangerousness.

11          This is not the case of a defendant who is dealing

12  drugs to support a habit on the street corner.  I'm not

13  belittling the seriousness of that situation, but that's not

14  what we have here.  This is much more serious.

15          This case involved significant planning,

16  significant ambition, reflected a leading role taken by him.

17          This is not your run-of-the-mill, crack-cocaine

18  case, even though it may be a smaller amount than some of the

19  other cases that come before Your Honor.

20          It is just -- it may just be a case that takes

21  place on Martha's Vineyard.  However, this defendant was from

22  Boston, which meant that he had to travel to

23  Martha's Vineyard.

24          He had to bring a supply of crack cocaine with him.

25          He had to do all the planning it takes to get from

1    Boston to Martha's Vineyard, and perhaps what's most

2    significant to me, Your Honor, is that it reflects the careful

3    design and ambition of a professional drug dealer and that he

4    realized that crack cocaine purchased in Boston could be

5    resold in Martha's Vineyard for almost double -- for double

6    what the price he could get in Boston is.

7            That's -- while that's very good business sense,

8    that reflects someone who is a professional drug dealer, as

9    opposed to a drug dealer who may have been dealing merely to

10   support his own habit.

11           This was someone who went to the point, went to the

12   effort of devising a plan of assessing the business climate in

13   Boston, versus Martha's Vineyard, taking advantage of the

14   context there, traveling there, going to all the outlay of

15   renting a hotel, booking a ferry ticket, transportation to the

16   Vineyard, all to take advantage of a more favorable business

17   climate for his drug business on Martha's Vineyard.

18           So I think that, as well, reflects the recidivism

19   that this defendant engaged in, which is why the Government is

20   asking for a -- for a Guideline Sentence.

21           In the Government's view, the Career Offender

22   Guidelines are intended to deal with serious criminals who

23   engage in violent conduct or in drug-dealing.

24           It's the Government's view that this defendant

25   meets that definition.

1          He does have the predicate offenses.

2          He clearly displays a recidivist nature, constantly

3    engaging in criminal conduct and most significantly, in the

4    Government's view, engaging in this crime less than a month

5    after he got out of jail on the -- on a different matter, and

6    this was a strictly professional drug-dealing crime,

7    reflecting ambition and design and planning, all of which are,

8    to the Government, this is a serious recidivist criminal, and

9    that's why the Government would request a Guideline

10   Sentence --

11         THE COURT:  When you say, "Guideline Sentence," the

12   Guideline's pretty broad here.

13         MR. MORAN:  Well, the bottom of the Guideline,

14   Your Honor, I think would be appropriate in this case, it's

15   210 months.

16         And I would also request at least three years of

17   Supervised Release.

18         In this situation, the Government thinks that,

19   perhaps, additions to his Release would be appropriate,

20   depending on how long the sentence is.  If The Court intends

21   to give a shorter sentence, perhaps a greater term of

22   Supervised Release would be necessary, and the Government

23   would finally note that there will be programs available to

24   perhaps help him deal with issues of job training and any

25   mental and substance abuse issues that he may have had in

1  prison to prevent this sort of recidivism from harming society

2  when he's eventually released and allowing him to become a

3  productive member of society, as well.

4  THE COURT:  Alright.

5  Thank you.

6  MR. MORAN:  Thank you, Your Honor.

7  THE COURT:  Ms. Fried?

8  MS. FRIED:  Your Honor, I don't believe a Career

9  Offender Sentence, a Guideline Sentence, is appropriate, in

10  this case.

11  First of all, the -- the conviction that The Court

12  is finding, it is necessary second predicate for this offense,

13  was a case that represented my client's very first contact

14  with the Criminal Justice System, coming when he was quite

15  young, and, in that case, he was originally sentenced with

16  probation.

17  He received a straight -- a sentence of straight

18  probation, and he was initially sentenced on that case.

19  The only reason that case comes into play, in terms

20  of affecting what The Court has determined is the Guideline

21  calculation, making him a Career Offender, is because

22  Mr. McGhee was subsequently arrested for a murder charge that

23  was ultimately nol-prossed.

24  THE COURT:  I raised the -- I interrupt you just

25  simply to make clear what I tried to make clear the last time.

1    The Government pressed the murder issue the last time.

2          I said I was not going to consider it for purposes

3    of sentencing, unless the Government was able to prove it.

4          The Government then chose not to press that, and,

5    so, while I think I understand the thrust of your argument,

6    I'm not interfering with the argument, except to make clear on

7    the record that Murder charges play no role, will play no

8    role, in my determination of what the proper sentence will be.

9          MS. FRIED:  I brought it up, because it affected

10   the way this sentence ended up coming again to be relevant, in

11   this case; in other words, because he was arrested on that

12   murder, although he was never convicted for it, a Revocation

13   proceeding was initiated, and, as a result of that Revocation

14   proceeding, founded on a charge that never resulted in a

15   conviction, the two-year sentence that he got on the

16   Revocation for that was imposed, and, because of the timing of

17   that two-year sentence, that revived, as it were, under this

18   application note we've spent so much time talking about,

19   4A1.2(d), that revived, or revitalized, shall we say, that old

20   adjudication, to make it countable for purposes of this whole

21   Guidelines analysis that we've been -- in other words, I guess

22   what I'm trying to say, is one reason why I think a variance,

23   a departure, would be warranted, in terms of discounting the

24   force that that conviction should have, in determining his

25   record:  One, the age of it, and the fact that it was his very

1  first; two, that it came to be even alive for purposes of

2  discussion, because of an arrest in a case that ultimately was

3  not prosecuted, and The Court may be familiar enough with the

4  way State court Revocations go, that it's often the case that

5  a Revocation will go based on some fairly de minimis showing

6  of probable cause to revoke probation with a serious sentence

7  being imposed, even though the probable cause would not rise

8  to any kind of a level that would support a conviction or

9  strong level of probable cause, especially in a Juvenile Court

10  proceeding.

11          But, nonetheless, because that happened, we're

12  here.

13          We're here, and The Court has decided that my

14  client ought to be characterized as a Career Offender because

15  of -- because of that, so I would argue to The Court that that

16  unusual set of facts and that unusual circumstance does not

17  reflect the serious -- does not correctly reflect and

18  overstates the seriousness of my client's Criminal History,

19  and I want to say a few other things on this.

20          Mr. Moran ended his allocation with talking about

21  how my client is a professional drug dealer.  I would simply

22  point out to The Court that the record, as reflected in the

23  Presentence Report, does not really support that.

24          There is this charge, which was a charge as a drug

25  distribution case.

1          His other priors, there is a marijuana

2     possession -- Possession With Intent to Distribute marijuana

3     case, for which he was adjudicated delinquent when he was Age

4     16, and, then, all the other cases, there is a simple

5     Possession of marijuana, also from that same time, Age 16, in

6     the year 2000, so eight years ago.

7          Those are the only other two drug charges on his

8     record, other than this case that he's being sentenced for

9     here now.

10          So it's simply not accurate, or it's contradicted

11     by the record of my client, to say that he's some kind of a

12     professional drug dealer, and, of course, we took the position

13     at trial that he had these drugs not to distribute but to

14     smoke for himself.

15          My client's, the Presentence Report, that talks

16     about my client's drug use history and his drug problems, make

17     clear that he does have, in fact, a serious drug problem, that

18     he's had a serious drug problem for a long time that has never

19     been treated, and the jury found, essentially, by refusing to

20     find that he -- by refusing to convict him of distributing --

21     or, of intending to distribute more than 5 grams, that, in

22     fact, he intended to keep some fairly large quantity; at

23     least, more than 3 grams, of those drugs for himself, so they

24     did not buy the proposition that all of the drugs there were

25     for sale, and, of course, we took the position at trial that

1  this other incident, he did not commit, the earlier drug

2  distribution that was alleged, about which evidence was

3  introduced at trial, we took a position, and we're not backing

4  down from that, that he did not commit that transaction.

5          So I would say that the ultimate Offense level and

6  Criminal History score, in this case, greatly overstate both

7  my client's past criminal record, and I don't want to minimize

8  my client's criminal record, as the way it was counted by the

9  Probation Department before The Court enhanced the sentence,

10  he had eight Criminal History points.

11          So there was a record there, and I don't deny that,

12  but the Criminal History score that results from ballooning up

13  this old Juvenile case from -- from 1999 greatly

14  over-represents the danger he presents to the community, and

15  that is one reason why I would hope The Court will consider a

16  substantial departure downward.

17          THE COURT:  How do I calculate that?

18          I mean, he gets himself in trouble every time he's

19  out, and relatively quickly.

20          I mean, the question for me, among other questions,

21  is one of specific deterrence for him.

22          Now, do I think the Guideline that's generated here

23  is ferocious?

24          Yes, I do.

25          Is it more than is necessary to reflect virtually

1 | every aspect of 3553?

2 |    Yes.

3 |    The one that has me concerned is specific

4 | deterrence, so how do you suggest that I calculate that?

5 |    MS. FRIED:  I think that The Court needs to fashion

6 | a sentence that allows for rehabilitation.

7 |    I think rehabilitation is a serious -- something

8 | that's been seriously lacking, and rehabilitation -- that gets

9 | to deterrence but not accomplished through incapacitation; I

10 | mean, there is going to be some amount of incapacitation, I

11 | realize that, but, if you really want to deter; that is, to

12 | stop, the maladapted behavior that's resulted in these

13 | arrests, then, my client has to have certain kinds of

14 | treatment that has never been made available to him before;

15 | like, a significant drug treatment program, which I know would

16 | be available in the Bureau of Prisons, because there's a 500

17 | Hour program, but I, also, think that conditions of Supervised

18 | Release ought to be imposed, so that we don't deal simply with

19 | a drug abuse problem, but deal, also, with what appear to be

20 | significant other emotional problems that are of very

21 | longstanding.

22 |    It's -- my client's childhood and the adult

23 | influences that were present were very, very deranging, I

24 | would say.

25 |    His mother, in particular, was a very, very, sort

1   of destabilizing, deranging influence, and, as it was, she

2   introduced him to drugs herself, before he was even ten years

3   old, which, you know, if that is who's raising you, you're

4   gonna have -- you're gonna have big problems, because your --

5   because your views of just, sort of, how you're supposed to

6   get along and what's been considered socially acceptable

7   behavior have been molded, have been molded in a very perverse

8   way, and there's strong evidence that that all has to be

9   somehow accounted for and treated, and that my client's in

10  need of therapy to deal with that, and that, he's never gotten

11  it, and here is the other thing that was -- and I want to sort

12  of address this whole business of getting into this trouble so

13  quickly after he got out of jail.

14          One of the things that we all -- that This Court

15  does and that most of the courts do when you impose a sentence

16  on somebody, is you have a -- you build into the sentence

17  structure a mechanism for reintroducing the person into

18  society.

19          We do it by putting people in Coolidge House or

20  other community correction centers for some period of months

21  before the person is actually released without supervision, so

22  that they can get counseling, they can find a job, they can

23  sort of get practice into going back into society.

24          My client was put out on the street after spending

25  two years, approximately, awaiting trial on a charge that was

1   ultimately nol-prossed, so he was not in a situation where he

2   was serving a sentence and getting any kind of rehabilitation

3   and being reintroduced.

4           Simply, the State authorities said, okay, we're not

5   proceeding on this.  The Court said:  Okay, you can go, and he

6   was simply dumped out on the street.

7           Now, I'm not saying that he didn't want to get out,

8   but he didn't have any kind of support that we, in the

9   community of professionals know people in that situation

10  generally need to have, because he'd been locked up for four

11  years.

12          His Juvenile probation was revoked, as a result of

13  that murder arrest in 2002, and I have the -- the paperwork

14  from -- the inmate sentencing paperwork from Walpole, showing

15  the amount of time, when his Revocation was imposed, and when

16  he finished wrapping up on that Revocation sentence.

17          He never saw the street.  He went straight from

18  wrapping up on that Revocation sentence, which was in

19  November of 2004, to when he was let out, in June of 2006, and

20  that was simply a pretrial detention-type situation, where

21  there's nothing, and no support made afterward.

22          He's not even on probation, at that point.

23          He doesn't have any kind of supervision, at all, so

24  he got into trouble, and that's what happened.  I think that

25  the way to deal with deterrence here, aside from

1    incapacitation, is to get him the support that he's never had,

2    in terms of dealing with these problems, but I -- I know that

3    The Court has made clear that it's not considering the Murder

4    case.

5           I feel I need to address it somewhat, though,

6    because I think it addresses -- The Court was inquiring of the

7    Government sort of its motivation.

8           Why is this case here?

9           Why is this case here?

10          I have to say that I think that Murder case that

11   never came to fruition is a big reason why this case is here,

12   and, you know, when push came to shove, we were last here in

13   September, the Government decided, after due consideration, it

14   wasn't going to pursue that, but that's at the end of a long

15   road, after we've already been here for almost two years.

16   When this case came into the system, it came into the system

17   in July of 2006, so I don't think -- I don't think it's

18   appropriate to ignore the fact that the -- that that Murder

19   case has a lot to do with why this case is here.

20          THE COURT:  Well, what do I do with that?

21          You say, and I agree, that that must be what's

22   driving -- one of the principal things that's driving the

23   Government to pursue this case against Mr. McGhee, and I say

24   I'm not going to considerate the case, in making the

25   calculation, I simply put it out of my mind, except that it

1    did have consequences as we move through the system, but I'm

2    not considering them on the merits, in any way.  So, I think

3    what I do is, I simply step back and say:  How would I treat

4    this, if presented with this individual who doesn't have that

5    charge involved?

6            Now, the question of prosecutorial discretion is

7    one that I'm interested in, but I don't think it can generate,

8    one way or the other, my decisions.

9            There has been a transformation in This Court of

10   the kinds of cases that are brought as long as I've been

11   involved in the court or a close observer of it, which is

12   really since 1975, when I started clerking here.

13           This kind of case would, then, not be brought.

14           New initiatives have started with the Department of

15   Justice, and so they've done something that, really, is

16   involved with identifying people that they believe should be

17   brought into the federal system, and they're entitled to do

18   that under the jurisdictional questions -- I mean,

19   jurisdictional provisions, but -- so what do judges do under

20   those circumstances?

21           I think they have to just treat these cases as if

22   they've been brought into the system, or would have been

23   brought into the system under other circumstances.

24           Now, if people are younger, you know, it's part of

25   my -- I can't call it advocation, but, from time to time, I've

1    traveled and gone to prisons, federal prisons, to see what

2    happens there, what the programs are like, who's there, and,

3    also, to make contact with people I've sentenced, if they're

4    open to that kind of discussion.

5              MS. FRIED:  Mm-hmm.

6              THE COURT:  And each time I ask the warden:  What

7    do you see here?  What's new?  What's happening?

8              And the wardens uniformly say, we've got a lotta

9    kids here, now.  We never used to see kids here now, we never

10   used to see kids, but these are not members of the play group,

11   either.  These are tough kids --

12             MS. FRIED:  Mm-hmm.

13             THE COURT:  -- who, for a variety of reasons, have

14   gotten themselves involved in serious crime, and they get

15   themselves involved in serious beefs in the system.

16             I visited with the warden at Leavenworth, and he

17   told me of conflicts between organized crime figures and

18   younger people there, younger people like to play music late

19   at night, and older organized crime people like to get their

20   sleep, and the conflicts were brutal, so we have a changing

21   demography, I guess.

22             MS. FRIED:  Mm-hmm.

23             THE COURT:  And, ultimately, that's not my

24   responsibility, anyway.

25             I should know what's going on in the prisons,

1  that's why I go there, that's why I talk to them, so I

2  understand what someone like Mr. McGhee is facing if he's sent

3  to prison.

4          MS. FRIED:  But all of that does inform your

5  exercise of your discretion under 3553A.

6          THE COURT:  Well, it does in a sense.

7          One of the lines that the warden at Leavenworth

8  used with me was:  You used to have to, you know, work your

9  way up to Leavenworth.

10          A guy who was involved with organized crime didn't

11  make it there on his first or second shot, he had to be a

12  recidivist.

13          Now, these kids get in much more quickly, although

14  they have the level of recidivism that takes them there, but

15  the question for me is how to deal with someone with the

16  profile of Mr. McGhee, who's had a horrendous childhood in

17  early life, has some serious drug and emotional, psychological

18  problems to confront, challenges to confront, who,

19  nevertheless, gets himself in jams, and that understates what

20  this is.

21          That DUIS didn't serve him particularly well is

22  clear to me.  They face challenges, there's no question about

23  that.

24          His dead time in Concord, I guess it was, turned

25  out to be the worst of all possible times.

1          MS. FRIED:  And there was a lot of it, too.

2          THE COURT:  Pardon?

3          MS. FRIED:  There was a lot of it, too.

4          THE COURT:  Right.

5          So there we are.

6          We are confronted with someone who is angry and has

7     real potential for getting himself involved again, so I'm

8     trying to make that judgment and telling you that the focus

9     for me is this question of specific deterrence.

10          I'm not sure that -- I mean, I know that you've

11     addressed that and thought about that, but that's conundrum

12     for me.

13          MS. FRIED:  Well, too, I sort of want to remind

14     The Court of what my role has to be, which is an advocate for

15     him.

16          THE COURT:  Sure.

17          Absolutely.

18          MS. FRIED:  And part of what I think it's my

19     obligation as his advocate to do is to remind The Court of,

20     not only these sort of characterological problems and sort of

21     therapeutic issues, too, but to remind The Court of how badly

22     he's been served and maybe unjustly served in the past, to the

23     extent that that informs an attempt to be fair here.

24          THE COURT:  Well, that's a kind of redistributive

25     question, as far as I can see.  You know, that he got a bad

1  shake the last time means that we give him a better shake than

2  he's entitled to this time.

3         MS. FRIED:  Well, I don't know whether it's that

4  cut and dry, but let's bring it back to him a little bit, in

5  terms of wanting to promote respect for the law, and that

6  criterion that's embodied within the Guidelines.

7         To the extent that harsh punishment is further

8  piled upon what may have been an unfair punishment, that is

9  not liable to promote this particular gentleman's

10 receptiveness to feeling like this is a society that he can

11 rejoin and look forward to anything, in terms of being fairly

12 treated.

13        I just think that -- I think I need to point that

14 out, and I don't know how The Court folds that in or figures

15 that in to what the appropriate amount of punishment should

16 be, in this case.

17        But I do think I would be remiss in not pointing

18 out that that is something that matters a lot to him, and that

19 there has been; certainly, from his perspective, there has

20 been a lot of his having to answer for a crime that he was

21 charged with once but never convicted of ultimately, never

22 convicted of at the end of the day, and that that has

23 snowballed, and, simply, he can't ignore that, I can't ignore

24 that, on his behalf, and I can't give you any further

25 guidance, but I will go back to the Sentencing Memo that I

1    filed, before we decided that this was a Career Offender case,

2    and just so the record's clear, I do not believe it should be.

3           My client has spent a lot of time in incarceration.

4    There is a mandatory minimum term of imprisonment here that

5    has to be imposed.  It's a five-year case.

6           I agreed with The Court's initial characterization

7    of this case, when Your Honor was characterizing it to

8    Mr. Moran, which is that this is a small State case.

9           I don't think that's an inaccurate

10   characterization, and -- and, perhaps, that's what we really

11   need -- we really need to come back to that, and how is it

12   appropriate to punish somebody for a small drug possession,

13   Possession With Intent to Distribute case, even though there

14   are all these other grand trappings around it, because we're

15   here in federal court, and there's a whole lot of other

16   strange procedural baggage that's happened in this case.

17          I would, it was my view, that the correct

18   Guideline, or is my view actually, that the correct

19   Guideline range here is 92 to 115 months, which represents

20   Criminal History Category 4, with an Offense Level of 26, for

21   the reasons that I set forth in my memorandum, and I still

22   believe that that's the correct Guideline Range.

23          I do believe that, even the bottom end of the

24   Guideline Range there, is excessive, in terms of what is

25   needed to promote the purposes of sentencing, in this case.

1           This Court has, of course, discretion to vary

2    downward, to depart downward, from the Career Offender

3    Guideline for a number of the reasons that we've talked about.

4           I would urge The Court to do that and to focus on,

5    really, what serves 3553A, in this case.

6           My client has been incarcerated for a long time

7    already, leaving aside the sentence that he's doing -- that

8    he's finishing up now, but he's spent a great deal of time in

9    custody, for reasons which we've already talked about, before

10   he ever got arrested on this case.

11          My client is going to -- is still a young man, and

12   he's going to rejoin society, and the question is:  How does

13   he rejoin?  What kind of a person is he?  How far -- how much

14   of a recovery can he make when he does come out?

15          This Court can have a lot to do with that, with

16   assuring that he is able to recover, in terms of giving him a

17   sentence that gives him reason to hope that he can have some

18   kind of a life instead of a sentence that's going to make him

19   feel like to him like a Death sentence or a Life in Prison

20   sentence.

21          Fashioning conditions of Supervised Release

22   afterwards, give him a chance to conquer his drug problem and

23   to deal with the emotional difficulties that have

24   characterized him and are almost certainly still there, and I

25   just want to say, too -- well, I guess I don't have anything

1    else to add, Your Honor.

2              The sentence that I ask for, I don't think is

3    inappropriate.  It seems low, in response to these Guidelines,

4    and I'd ask The Court to impose a sentence of sixty months.  I

5    don't think that's inappropriate -- an inappropriately low

6    sentence in this case, and I would ask The Court to do that.

7              THE COURT:  Alright.

8              MS. FRIED:  And I know that Mr. McGhee wants to --

9              THE COURT:  Yes, I'll want to hear from Mr. McGhee.

10             THE DEFENDANT:  Good morning, Your Honor.

11             Your Honor, last night and this whole week I was

12   thinking about what to say here.

13             At first, I wasn't going to say anything at all.  I

14   wasn't going to say too much, but I came here today and heard

15   everybody say what they had to say about me.  I wanted to give

16   you more of an insight of my life.

17             Now, I want to.

18             Your Honor, in '99, I participated in an

19   Armed Robbery.  Fifteen years, I participated in it.  Holding

20   a gun to somebody was never my objective.  It happened, and I

21   can't say it didn't happen, you know?  I played a part in it,

22   you know?

23             I'm not saying that -- you read the record, so you

24   know I wasn't the person holding the gun or anything, but I

25   still played a part.

1          How will they say, Aided and Abetted, I played a

2     part.

3          Your Honor, after that, I got sent to Juvenile.

4          I felt bad for what I did, because, after getting

5     outta that, same -- same situation happened to me, and I felt

6     scared that I put it in somebody else's lap.

7          Now, these other charges that they're talking

8     about, Your Honor, Possession With Intent to Distribute.

9          I got caught with two bags of weed.

10         Because it was in separate Baggies, I got Intent to

11    Distribute.

12         Lawyer told me the best thing was to plead out.  I

13    got caught again with another bag.

14         Possession.

15         The Assault and Battery that he's talking about, I

16    took a joy ride.  The car was stolen.

17         The police pulled me over.  It was a stick shift.

18    I don't know if you're familiar with that.

19         When I came off the clutch, I bumped the police

20    car.  I got Assault and Battery charge.

21         Now, Your Honor, I went to jail for that.  I came

22    out, Your Honor.  I was locked up for Murder.

23         Now, I always pull my innocence in that case, from

24    Day 1 until the day I was released, but, due to that, I got

25    violated on my probation for the Armed Robbery.

1          At the time of the violation, the judge told me,

2     along with my attorney told me, but the judge told me

3     personally, he said:  I'm giving you this two years.  Within

4     this time, if you get rid of this case, if you beat this case,

5     you come back, and I'll reinstate your probation.

6          '04 is when I wrapped up that case.

7          I still have a Murder case.

8          Two years later, it happened, it got dismissed,

9     but, within that time, I got the two years, Your Honor, two

10    years in the State system, usually, you're able to go the

11    minimum and get some type of stuff, as you've seen in the

12    reports, that I have applied for all types of vocational

13    whatever type of programs I could get into, but, due to my

14    jacket saying I had an open Murder case, I wasn't allowed to

15    get in there.

16         I wasn't considered a priority.

17         I wasn't allowed to go to a minimum.

18         I was actually sent to the maximum security for two

19    years; then, when I finished the time, I was considered 52A,

20    then, for the Murder case.

21         I was sent back to a maximum security.

22         The day I got -- I didn't get to participate in no

23    groups.

24         Nothing.

25         Your Honor, when I first got the time, I was upset

1   because I had a Murder case that I didn't do, but I still felt

2   that, you know, I didn't do it.  They'll figure it out and

3   I'll get out.

4           It's two years, and they'll try to get this, try to

5   get that, calling whatever I can, but I wasn't allowed in the

6   program.

7           After that two years pass and they still don't help

8   me, Your Honor -- you said something earlier that nobody in

9   the jail is thinking about my past -- I got angry.

10          I got angry, Your Honor, because I was sitting in

11  jail for something I didn't do, and I was around 80% of the

12  people who were locked up for the rest of their lives telling

13  me:  Man, it don't matter if you did it, or not.  Look like

14  you gonna hold this time.

15          Got angry.

16          Escaped that angriness.

17          I was introduced to drugs:  First, you know, pills,

18  sleeping pills, stuff like that, but, then, I was introduced

19  to more stuff, and I started dabbling in that, too, to escape

20  from the reality where I was coming from.

21          Then, four years later, my lawyer told me they're

22  not going to prosecute this.  Due to all the evidence coming

23  forward, these are the people saying we're not going to

24  prosecute this.

25          I felt happy, Your Honor, but I was already

1    trapped.

2          I was angry, so I picked up stories, and stuff,

3    this and that.

4          I was just angry, Your Honor, and my mind was

5    filled with a whole bunch of irrelevant things, so I was

6    released, Your Honor, not just even sentenced in the

7    courtroom.

8          Just released.

9          No nothing.

10         I came home and I still was able to do better, some

11   of the demons in jail, something I never really thought about.

12         I heard people wanted to kill me, because, in four

13   years, I been portrayed as a murderer, you know?

14         I had to sit down with the victim's family, some of

15   them.  They didn't believe, due to evidence that came, but his

16   friends, outside his family, still wanted blood.

17         Now, Your Honor, I had a choice.  I coulda turned

18   into what they said I was before, went to war on the streets,

19   but somebody gave me an opportunity to get outta the area.

20         It wasn't a good choice, but, when I got to where I

21   was going, you would see from this case what was happening

22   here, and I fell into it, you know?

23         And I was charged.

24         Now, like I told you last time I spoke to you in

25   court, I take responsibility for my own doings, but I wanted

1    to give you an insight of my history.  They say that I'm a

2    dangerous person.

3              I don't feel that, Your Honor.

4              Like I said, a lot of things changed back and

5    forth.

6              I was angry.  I was angry for a long time,

7    Your Honor, and, you know, I'm still a little bit angry, but

8    my past records and everything that I see, the injustices,

9    injustices, to me, it's all in the past.

10             What changed me from thinking like that was

11   thinking:  Oh, they owe me something.  They took this time for

12   a crime I didn't do.

13             While I was locked up, I couldn't do this.  I

14   couldn't do that, and it all changed, and I'm going to tell

15   you why it all changed.

16             It changed because I have a two-year-old son.  He

17   comes to see me every week, and now he's growing, talking,

18   starting to use the potty by hisself.

19             To me, change was nobody owes you nothing.

20             Now, to owe somebody, owe him to not be standing in

21   front of you ten, fifteen years down the line in the same

22   predicament.

23             Now, this sentencing stuff, all of this, I can't

24   tell you how to sentence me, Your Honor, but all I can do is

25   ask you to let me get that help.

1          Sentence me to something where I know I'll get

2   there, wherever I'm going, whatever my fate gets to, I'll get

3   a chance to change.

4          I'll get a chance to tell my son some of the

5   stories that you heard before.

6          As for rehabilitation, I can't tell you how to

7   rule.

8          That's all I can say, and I thank you for letting

9   me talk.

10         THE COURT:  Thank you.

11         Well, the way in which I'm obligated to sentence is

12  to try as best I can to find the Guidelines that are

13  applicable that become the first point, and here we've got

14  Guidelines of 210 to 262 months in prison, subject to a

15  certain amount of time, from, basically, July 10, 2006,

16  forward, of time served, but the Guidelines are a construct,

17  and, here, the Guidelines, I think, have contorted the

18  defendant's Criminal History that I may rely upon, and I go

19  back to this question of the Murder case.

20         It may well have been the motive for the extra

21  interest of the United States Attorney's Office and other law

22  enforcement people to bring the defendant here, but I'm

23  putting it out of my mind, because that's not part of the

24  consideration.

25         So where do I put the sentence?

1          Well, I have to consider the seriousness of the

2   offense.

3          As I indicated, this is not the kind of offense

4   that classically appears in the federal court.  The federal

5   court, classically, is the place for large scale drug dealing.

6   This is not that, but federal court has jurisdiction over

7   that.

8          I have a mind as well, I fold into the question of

9   the seriousness of the Defense in promoting respect for the

10  law.

11         The degree of recidivism that the defendant has

12  shown, that he's come back to offend with some regularity.

13         That's how the Guidelines work, mechanically, to

14  bring the defendant up to the 210 to 262 months, but you

15  pierce a little bit below the surface on that, and what you

16  see is a troubled younger man who has not yet found ways to

17  control his impulses, and this is of, I won't say modest, but

18  beefs that don't, in my mind, don't justify the

19  Guideline range, when considered in light of 3553.

20         My own view is that this is a case that really

21  doesn't belong within the Guideline structure, that, while I'm

22  obligated to consider it and I do, that's not what this case

23  is about.

24         The case is about how you deal with a young man who

25  has faced challenges, is not ready to go back on the street,

1  has committed serious offenses.

2          I don't mean that by saying they don't belong in

3  federal court, I don't mean to suggest that they're not

4  serious offenses, they are, but this offense and the others

5  that are more chargeable here, but this contortion of the

6  Guideline system can't obscure what I think this properly

7  focuses on, which is that, not only did the defendant not get

8  real benefit from such benefits as the State system can

9  provide, but he got the worst of it.

10          The substantial period of dead time for the Murder

11  case and a treatment without -- I shouldn't even say

12  treatment, just put in the system for warehousing purposes,

13  and nothing else, so calibrating the seriousness of the

14  offense under these circumstances, on its face, I would be,

15  likely to say that this is a case in which I would impose a

16  sentence of 120 months, but I can consider further discount,

17  and the further discount is the dead time.

18          So long at the dead time doesn't effect the

19  rehabilitation considerations and the other considerations of

20  deterrence, it seems to me that I properly can take from the

21  defendant's sentence of 120 months, a period of twenty-nine

22  months, that's basically the dead time period here, and, so, I

23  do.

24          The dead-time period, as I understand it, will be

25  October 9, 2002, through March 2005, although he remained in

1    DUIS custody, he remained detained for a period thereafter;

2    didn't he?

3              MS. FRIED:  I'm sorry?

4              THE COURT:  You're going to have to explain to me

5    how the dead time works here.

6              He's -- he's arrested on -- or taken into custody

7    in October of '02.  He's --

8              MS. FRIED:  Let me look at the --

9              THE COURT:  I'm looking.  You can look at other

10   things, I'm sure, but I'm looking at Paragraph 54.

11             MS. FRIED:  50?

12             THE COURT:  54.

13             (Pause.)

14             MS. FRIED:  It looks -- okay.

15             It looks like September of '02 was the date of the

16   arrest.

17             THE COURT:  I think it's October 9 of '02.

18             MS. FRIED:  Okay.

19             (Ms. Fried conferred with the defendant.)

20             MS. FRIED:  Well, I don't have records for this,

21   but Mr. McGhee is telling me the actual order of events is I

22   guess there was some sort of a -- he got picked up and was

23   held in custody, related to this case on a DUIS warrant --

24             THE COURT:  The Murder case?

25             MS. FRIED:  Yes, the Murder case, in June of 2002,

1   so, before October.

2           And that, I guess, the time between June and

3   September or October -- and I don't have records for this, but

4   this is what Mr. McGhee was telling me -- was time that he had

5   spent in custody while they were formulating the charges, so,

6   it may not be correct that the dead time was running that

7   late.

8           THE COURT:  Okay; so -- but let me be sure that I

9   get this --

10          MS. FRIED:  Okay.

11          THE COURT:  -- more or less right.

12          The date of the arraignment on the Murder is

13  September 4, and he's taken over to Suffolk on <u>de minimis</u> on

14  October 9.

15          You're saying that he was picked up on the DUIS in

16  June of '02?

17          MS. FRIED:  Yeah.

18          I think that's what my -- I think that's correct.

19          (Ms. Fried conferred with the defendant.)

20          THE WITNESS:  Yes.

21          THE COURT:  Does Probation have it?

22          U. S. PROBATION OFFICER PAIVA:  It looks like

23  Your Honor is correct, that, as a result of a warrant that was

24  issued on the original Murder charge, he appeared in court on

25  September 4 of '02.

1          Let me just look at the . . .

2          (Pause.)

3          MR. MORAN:  Your Honor, if I may attempt to be

4     helpful.

5          THE COURT:  Sure.

6          U. S. PROBATION OFFICER PAIVA:  Sorry.

7          MR. MORAN:  When I reviewed the DUIS custody

8     history, he was in Plymouth Secure, starting on June 4, 2002,

9     and was there until September 3, 2002, but the transfer as of

10    June 4 could not have been as a result of the Murder, because

11    the murder took place on June 9, 2002, and there could not

12    have been -- so he could not have been transferred on June 4

13    as a result of a murder that took place on the early morning

14    of June 9.

15         THE COURT:  Let me -- let me -- I don't have the

16    stuff in front of me, so let me understand this again.

17         The murder takes place June 4, right?

18         MR. MORAN:  June 9.

19         THE COURT:  June 9, okay.

20         He's taken into custody by DUIS on June 4?

21         U. S. PROBATION OFFICER PAIVA:  I'm sorry,

22    Your Honor.

23         He's taken into custody on June 12.

24         THE COURT:  June 12.

25         U. S. PROBATION OFFICER PAIVA:  Yes, of '02.

1            MS. FRIED:  That's . . .

2            THE COURT:  Because the chronology, as I heard it

3  anyway, may not have been what you suggested, but would have

4  him in custody before the murder.

5            MR. MORAN:  And I have a note that he was in

6  custody as of June 4 in Plymouth.

7            THE COURT:  That would make it very difficult to

8  commit the Murder on June 9.

9            MS. FRIED:  Sure would.

10            MR. MORAN:  Yes.

11            THE COURT:  And I don't think anybody here is

12  suggesting that he wasn't out at the time of the murder --

13            MR. MORAN:  Maybe he went into custody on June 14

14  in Plymouth on that, but the murder was June 9.

15            THE COURT:  So we'll say mid-June of '02, and he

16  stays in dead time -- he stays in custody, as a result of the

17  Murder charge, through June 12, '06.

18            Basically, forty-eight months, without any other

19  outstanding matter.

20            Is that correct?

21            I mean, apart from the fact that this is --

22  implicates the DUIS.

23            MS. FRIED:  I believe that that's correct.

24            I don't think he was ever out on the street again.

25            Is that right?

1                 THE WITNESS:  No, I wasn't.

2                 MS. FRIED:  He was never out again so, he was in

3     jail for four years.

4                 THE COURT:  With no other crime -- no other pending

5     charges, right?

6                 Apart from the DUIS Revocation.

7                 MR. MORAN:  Your Honor, yes.

8                 First, it's a DUIS parole -- the Youthful Offender

9     Indictment, the parole is revoked, and he gets --

10                THE COURT:  But the parole is revoked because of

11    the Murder charge, not anything else.

12                (Pause.)

13                MS. FRIED:  That's correct.

14                MR. MORAN:  If I might have a moment.

15                THE COURT:  Sure.

16                MR. MORAN:  We submitted certified copies of the

17    docket on that.  If I might have a moment to look at that,

18    Your Honor?

19                THE COURT:  Sure.

20                (Pause.)

21                MR. MORAN:  Your Honor, I don't have, actually,

22    any -- we know that he -- there's a parole violation on

23    June 12.  I don't have any record of it in the -- on the

24    docket sheet of the Youthful Offender, there's no --

25                It's Exhibit 2 to my Sentencing Memorandum.

1          There's no -- there's a matter, I think, on

2    April 17, 2002, in which he was found in violation of

3    probation, then, and, then there's no further listing until

4    September 26, 2002, which is as a result of the new arrest,

5    which I'm assuming is the arrest on the basis of the murder,

6    but I don't have -- but I'm not sure if that explains the

7    change in his status.

8          (Ms. Fried conferred with the defendant.)

9          MR. MORAN:  Other than that, that appears to be the

10   end of it, Your Honor, and I think that the Youthful Offender

11   Indictment was -- but that's not right; that's no help.

12         Yes.

13         I don't know by what mechanism he was transferred

14   to Plymouth, why he was put into custody on June 12, 2002.  I

15   don't have a record of that, Your Honor.

16         The docket sheet of -- the certified docket sheet

17   which the Government has submitted, does not, the first

18   incident it records is September 26, 2002, and may I just add,

19   Your Honor, that the Government does not agree -- I feel it's

20   my duty, to the best I can, to supply the facts --

21         THE COURT:  Mm-hmm.

22         MR. MORAN:  -- and make this clear:  The Government

23   does not agree with crediting dead time, since there was an

24   Indictment and probable cause was found for it.

25         THE COURT:  This is a question of my calculating --

1           MR. MORAN:  I --

2           THE COURT:  Just a moment, so we understand -- my

3   calculating the proper way to make use of prior

4   Criminal History in this case.

5           It's not a formal crediting of dead time, formal

6   crediting of dead time in the sense that time served is a

7   formal crediting of time.

8           He served time, we'll all agree, I guess, maybe we

9   won't, but he served time on this charge since July 10, '06.

10          That's when he was detained in State custody on the

11  related case, related charges.

12          MR. MORAN:  Actually, Your Honor, I don't believe

13  that's correct.

14          I think the calculation of time served would have

15  been a little more complicated than that in this case,

16  because, as you'll recall, he -- between the time when he was

17  sentenced, he took a -- he took a -- he pled out to the gun

18  case in State Court, so he's actually been serving a State

19  sentence.

20          That's why we've been bringing him by habeas, but

21  I --

22          THE COURT:  Well, I guess, and let me just focus on

23  this.

24          There are two different things:  What, if any, the

25  time served, he will be credited with, as far as I'm

1    concerned, time served.

2         Now, the question of dead time on the Murder case

3    is something that I'm going to calibrate into the sentence I

4    impose, and I do so because it seems to me that it is a way of

5    reflecting more accurately his Criminal History and the

6    seriousness of the offense for which he's charged here, so I

7    start with some sense of where the proper sentence would be

8    for me.

9         On this sentence, it's about 120 months.

10        I'm going to factor in some other things, as well

11   in this, but it's not quite fair to say -- it's not quite

12   accurate to say that I'm making dead time, time served,

13   because I'm not.

14        MR. MORAN:  I appreciate that, Your Honor.  I don't

15   mean to misstate what you're doing, and I want to be as

16   helpful as I can, with regard to the facts of the case.

17        I don't want that attempt to be helpful to be

18   misconstrued --

19        THE COURT:  No.

20        MR. MORAN:  -- as the Government acceding to

21   your --

22        THE COURT:  Right.

23        MR. MORAN:  It would be my position that in a case

24   where there had been an Indictment based on probable cause,

25   while it may be -- and, well, more importantly than that, as

1   far as the probation violation, in that the -- for which he

2   served from September -- at least, September 26, 2002, that

3   was on the basis of a Revocation which was found separate -- I

4   imagine that was on the basis of the Murder,But, as Your Honor

5   is aware, it's a separate standard of proof,So the fact that

6   the Commonwealth may not -- may have chosen -- and I hesitate

7   to go into this, because I realize it was my burden to prove

8   the Murder, and the Government chose not to do that, and that

9   was why I refrained from arguing it at all in my allocation to

10  Your Honor, but, now, it's a question of figuring out what

11  happened procedurally beforehand, I just want to point out

12  that the Commonwealth chose not to go forward and attempt to

13  prove the Murder case beyond a reasonable doubt.

14          The judge who found the Revocation did so on the

15  basis of a different standard of proof, and so while maybe I

16  appreciate that it is unfair for Mr. McGhee to base an

17  argument as to his criminal history on it, because that was

18  never proved beyond a reasonable doubt, I think it may

19  misconstrue the record to suggest that -- I think it does

20  misconstrue the record to suggest that there was no basis for

21  finding that he committed a Revocation upon a preponderance.

22          THE COURT:  Assuming that there was a basis for it,

23  which I do --

24          MR. MORAN:  I guess I'm just --

25          THE COURT:  Just a moment.

1          -- it extends no later than March 24, 2005, which

2    is his wrap-up date in DUIS.

3          MR. MORAN:  Yes, Your Honor, and, as well, I'm not

4    sure about the period from July to September.

5          Again, I want to make sure the record is clear.

6          I don't know why he's held, so maybe that's June to

7    September, as well, I don't know, but I agree with Your Honor

8    that, from 2005, to -- March 24, 2005, to June of 2006, it

9    appears to be time solely for pretrial detention on a case

10   that was nol-prossed.

11         I agree with Your Honor about that, but, as to the

12   sentence time, that was based on a probation violation which

13   The Court must have found proven beyond a preponderance, and,

14   so, I don't think that can be considered.

15         I know dead time's not the precise term, but that

16   would not be considered time served awaiting a case that was

17   never proven.  That would be time served applicable to a

18   separate violation that was proven to the standard applicable

19   to that matter.

20         MS. FRIED:  Your Honor, if I could just weigh in on

21   that --

22         THE COURT:  Sure.

23         MS. FRIED:  -- discuss it briefly, and it's simply

24   to take issue with this March 24, 2005 date as being relevant

25   to whether or not that is when he stopped serving a sentence

1    on the Revocation for the Armed Robbery, and the reason why I

2    want to do that is because I have here a document that I'd be

3    glad to show to opposing counsel and bring it to The Court,

4    which is the inmate sentencing listing for Mr. McGhee, that

5    shows what his sentence structure was and when he wrapped up

6    and how much good time he got on that case, and what it shows

7    is that his maximum date of incarceration on the Revocation

8    would have been December 10 of 2004, would have been the

9    maximum wrap-up date, not going into March of 2005, Number 1.

10          It, also, shows, however, that, in addition to

11   that, he had thirty-seven-and-a-half days of good time coming

12   off of that.

13          I'm showing this to opposing counsel.

14          (Handed to counsel.)

15          MS. FRIED:  Coming off of that December 10 date, so

16   you would actually go back to November, early November, and,

17   that we said that the actual wrap-up date on that case was

18   November 2 of 2004, so there is -- what does that amount to,

19   about a four-and-a-half month discrepancy, November of 2004

20   versus March of 2005, and I'll hand you that document --

21          THE COURT:  Alright.

22          MS. FRIED:  -- if The Court wants to see it.

23          THE COURT:  I do, but let me go back to the --

24          MS. FRIED:  But --

25          THE COURT:  So I understand this more fully.

1           MS. FRIED:  But on this other issue, we would agree

2    that there is no -- and I can't confirm the June 12, '02, to

3    March 2 -- excuse me, September 26 of '02 -- but it appears

4    that Mr. McGhee was continuously in custody, either in DUIS

5    custody, or serving the sentence on the Revocation, or in

6    Pretrial Detention, one of those three categories of custody

7    from June of 2002, until June of 2006.

8           Could I take that to the judge?

9           MR. MORAN:  Just a minute.

10          (Off record between counsel.)

11          MS. FRIED:  Could I just approach, Your Honor?

12          THE COURT:  Yes, but --

13          MS. FRIED:  I'll just give this to your Clerk.

14          THE COURT:  Right.

15          (Handed to the Clerk.)

16          THE COURT:  But let me introduce another dimension

17   to it.

18          (Handed to The Court.)

19          THE COURT:  The defendant was sentenced on the

20   Receiving a Stolen Motor Vehicle on March 29, '02.

21          MS. FRIED:  What paragraph are you looking at?

22          THE COURT:  46.

23          MS. FRIED:  Thank you.

24          THE COURT:  He was sentenced to ninety days to

25   serve.

1          Presumably, he was serving that time, on that

2    offense, whether or not -- and I don't know what the

3    Revocation implications are for that one, but he served ninety

4    days or so, which takes him to, assuming that he'd start

5    serving at that point, which I assume he did, it, takes him to

6    June of '02.

7          U. S. PROBATION OFFICER PAIVA:  Your Honor,

8    according to the DUIS placement record, he was paroled.

9          He was serving an Adult sentence from

10   March 8 of 2002 and was released on 5/28/02, so he was, on

11   parole from 5/28/02, until he was picked up on June 13 of '02.

12         He was out --

13         THE COURT:  So the June 13 is the Murder charge?

14         U. S. PROBATION OFFICER PAIVA:  Yes.

15         THE COURT:  That's the -- that's the -- that's the

16   basis for the Revocation?

17         U. S. PROBATION OFFICER PAIVA:  It appears -- the

18   dockets are -- are certainly unclear, but, if you look at the

19   dates of DUIS and the dates on the dockets and his

20   Criminal History, it doesn't appear that there was any

21   additional new criminal conduct during that time period, so I

22   would -- I would have to --

23         THE COURT:  Was there, in fact, a Revocation

24   decision made by a judge?

25         U. S. PROBATION OFFICER PAIVA:  On?

1              Yes.

2              According to --

3              MS. FRIED:  I'm sorry.

4              Which case is The Court inquiring about, with

5       regard to Revocation?

6              THE COURT:  Arising from the murder.

7              MS. FRIED:  No, but I mean, Revocation decision in

8       what underlying case?

9              THE COURT:  On the Armed Robbery.

10             MS. FRIED:  On the Armed Robbery?

11             (Ms. Fried conferred with the defendant.)

12             MS. FRIED:  I'll hand you this document, which is

13      the Armed Robbery docket, and, specifically, if you go to the

14      second -- the second of these three pages shows you, sort of,

15      the 2002 docket.

16             THE COURT:  That's the decision of 9/4/02?

17             MS. FRIED:  It's the -- it's the -- those are the

18      docket sheets for the Juvenile Armed Robbery, and it simply is

19      a running list of the different court dates on which he was

20      before The Court.

21             THE COURT:  When was the violation of the probation

22      notice?

23             MR. MORAN:  I think that Violation of Probation

24      Notice, Your Honor, was 9/26/02.

25             MS. FRIED:  It looks like it's about the third line

1  from the top of those entries, and it says:  Violation,

2  Violation of Probation Notice, as a result of new arrest

3  issued for McGhee, for Winston McGhee; and, then, there's a

4  writ of habeas corpus to bring him in from Nashua Street Jail

5  on that day.

6          THE COURT:  So there was a judgment by

7  Judge Roper (phonetic) on September 26 that there was probable

8  cause to believe that he had violated his probation notice?

9          MS. FRIED:  I don't know.

10          It looks more to me, Your Honor, that that happened

11  on December 4, before Judge Craven (phonetic).

12          There was a habeas issued --

13          MR. MORAN:  Right.

14          I think you're right, Your Honor, there must have

15  been a Termination of Probable Cause as to a probation

16  violation, which would have resulted in a notice being sent.

17          I think Your Honor must be correct.

18          THE COURT:  And, then what other judicial act had

19  to be taken?

20          MS. FRIED:  I don't know.

21          I'm not familiar enough with the procedures.

22          THE COURT:  I tell you.

23          You know, I don't want to extend this artificially,

24  but this is a matter of some interest to me, some importance

25  to me, so, if there is a judicial act which kept him in prison

1  for a period of time, I'm not going to treat it as dead time,

2  and the outline that I have for this is that he's got to

3  wrap-up date that you say is even earlier than the one

4  reported, I'm not sure exactly how that works.

5           MS. FRIED:  On that sheet that says --

6           THE COURT:  Right.

7           MS. FRIED:  -- inmate sentencing?

8           They string the numbers together in a way that

9  makes them difficult to read, but there's sort of a minimum

10  and a maximum, 2002 to 12/10, 2002 to 12/9 -- or, excuse

11  me,2004.

12           Excuse me.

13           I think it says:  Violation imposed, I believe it

14  reads on the left side of the paper, 2002, 12 -- I think it's

15  12/10.  I think that's what it says.

16           It's either 12/9 or 12/10, and, then, there's a

17  minimum and a maximum that are one day apart on the right

18  side, and I think that that's '04.

19           It says:  2004, 12/10, and 2004, 12/9, on the right

20  side of the paper.

21           THE COURT:  Right.

22           But what does that mean?

23           MS. FRIED:  It means that the sentence -- that the

24  two years and a day was imposed two years earlier -- I think

25  it's 12/10/02, and that the minimum is the two years after,

1   and the maximum was a day later.

2          So, in other words, 12/10/02, two years before

3   that -- two years after that is 12/9/04, and two years and,

4   day after that is 12/10 of '04.

5          Down on the bottom, there's something that says

6   earned good -- earned good time, 37.5 days.

7          MR. MORAN:  Your Honor, I -- I -- that sounds

8   correct to me, too, in listening to Ms. Fried.  I hadn't seen

9   that document before, but, as she recites it, it sounds like

10   that makes sense.

11          THE COURT:  So what does that mean, in terms of --

12   and let me put it this way, see if I can clarify this block of

13   consideration:  I am inclined to believe that, if there is a

14   judicial act that keeps him in custody, apart from a simple

15   detention order, but a judicial act based on a determination

16   of probation or parole violation, then, I don't treat that as

17   good time -- as dead time.

18          I only treat as dead time from the wrap-up on this

19   forward, but, in this collection of matters, I'm a little

20   concerned about precision, to be perfectly candid.

21          MR. MORAN:  I appreciate your concern, Your Honor.

22          If I may make a suggestion.

23          Perhaps the date to use is 9/26/02, which is when

24   there must have been a determination of probable cause, as to

25   the probation violation, through December 10, 2004, minus

1    thirty-seven days?

2              Is that --

3              MS. FRIED:  Thirty-seven days comes off the back

4    end.

5              MR. MORAN:  Right, the good time.

6              MS. FRIED:  Yeah.

7              MR. MORAN:  So whatever December 10 is, take --

8    would that be November 3, then?

9              MS. FRIED:  Yeah.

10             We had it November 2.

11             MR. MORAN:  But my suggestion, Your Honor, would be

12   September 26, '02, through November 3 of '04, would be time

13   spent in detention, as a result of a judicial determination,

14   and I calculate that by 9/26/02 appears to be when a

15   determination as to probable cause, as to a probation

16   violation, must have been made by Judge Roper (phonetic),

17   through the end of the sentence that he received, as a result

18   of probation violation.

19             THE COURT:  And that's 11/02 --

20             (An off-the-record discussion between counsel was

21   held.)

22             MS. FRIED:  I think it's 11/2 of 2004.

23             THE COURT:  4?

24             MS. FRIED:  Your Honor, I'm simply not prepared to

25   comment on the propriety of including September 26 through

1   December 10.

2                I don't know.

3                THE COURT:  Okay.

4                I want to make clear that I'm not engaged in the

5   process of figuring out time served.

6                I am engaged in the process of thinking about what

7   chunk of time the defendant had that was dead time, that can

8   properly be considered to be dead time.

9                MR. MORAN:  Right.

10               THE COURT:  And, if there's uncertainty about this,

11  then, I'm going to do it until I get it right.

12               MR. MORAN:  I appreciate that.

13               Your Honor, the Government's attempting to elicit

14  the fact we don't concede that this is -- we don't want to

15  concede any arguments, but, if I understand Your Honor

16  correctly, the task before us now is to make the best

17  determination, as to what actually happened that we can.

18               THE COURT:  Right; and I'm not sure that we can

19  from these papers.

20               Go ahead, I'm sorry.

21               U. S. PROBATION OFFICER PAIVA:  And I could

22  certainly request from DUIS some more information, but I do

23  want to note, also, what appears -- it appears that, if you

24  look at the Youthful Offender conviction, the docket ending in

25  44, that's the one where the violation of probation and he

1    received the two years and one day committed, which I believe

2    is where we're calculating the dates of 9/26/02 to

3    November 3 of '04, but I, also, note that the docket ending,

4    the second Count of that conviction, back in November of 2000,

5    the original adjudication, was that he was committed to DUIS

6    until he was 21, so that's likely the reason he -- he remained

7    in custody, was because he was committed until he was 21.

8            However, it would appear that they -- and, again,

9    I'm speculating, that he was held in custody, obviously, based

10   on that pending Murder charge, is the way I'm --

11           THE COURT:  Okay.

12           The way I'm going to deal with this, because,

13   frankly, there are too many uncertainties, I'm going to charge

14   Probation with the responsibility of pulling these figures

15   together, including finding out from DUIS, and providing an

16   addendum, and what I'm concerned with, just to recapitulate,

17   is that period of time when the defendant was held solely

18   because he was charged with -- facing the Murder charge,

19   arraigned on the Murder charge.

20           I do want to know, as well, the period of time the

21   defendant could fairly be said to be being held for revocation

22   of probation, and I'm making the assumption, from these

23   papers, that he was adjudicated to be in violation of his

24   probation, against a lesser standard, to be sure, but that's a

25   judicial act that cannot properly be called dead time, cannot

1    properly be said to have created dead time.

2              Once the -- once the defendant is being held solely

3    for purposes of answering to the Murder case, and not

4    something else, it's a different matter, so there are really

5    two periods of time that I think I'm focusing on here.

6              U. S. PROBATION OFFICER PAIVA:  I will contact DUIS

7    to get the specific, more specific, information about the

8    actual Revocation.

9              If I understand Your Honor correctly, you're

10   interested in the period of time where he was held solely for

11   the Murder charge and the period of time that he was held for

12   Revocation.

13             Does Your Honor --

14             THE COURT:  He could have been held for Murder at

15   the same time.

16             He was being held for Murder at the same times,

17   but, to the degree that there's an adequate and independent

18   grounds for holding him, which is the probation violation,

19   which is generated by the judge deciding that, against the

20   standard -- I don't believe it's fair preponderance; is it?

21             MR. MORAN:  I -- I don't want to misspeak,

22   Your Honor.

23             I don't understand.  I don't know.

24             THE COURT:  You don't know?

25             MR. MORAN:  But it had to be by some standards is

1    my assumption.

2            THE COURT:  In any event, the standard according to

3    which someone is determined to be in violation of probation or

4    parole.

5            MS. FRIED:  I will see if there's any way to get a

6    record of what actually happened, if there's a transcript.

7            THE COURT:  Okay.

8            MS. FRIED:  It's a long time ago so, there might

9    not be a transcript, but there might be.

10           THE COURT:  In any event, let me state, briefly,

11   what else is on my mind.

12                       (Pause.)

13           THE COURT:  I started with a figure of 120 months,

14   which I synthesize as being a fair representation of the

15   seriousness of the offense and the nature of the defendant's

16   criminal background.

17           It captures it more successfully, I think, than the

18   Guidelines do, because the Guidelines, it seems to me, as I've

19   said, are contorted here, and, so, I don't really view this as

20   a Guidelines case, having fully considered the Guidelines and

21   their application, including the Career Offender Guideline.

22           I look to the question of general deterrence, and,

23   insofar as general deterrence is concerned for a person

24   committing these kinds of crimes, the idea of 120 months in

25   prison seems to me to be a general deterrent and not an

1    over-deterrent or an under-deterrent.

2            I am concerned, as I've said, to Mr. McGhee, about

3    specific deterrence.  Is ten years enough time to be spent in

4    prison to keep Mr. McGhee from engaging in these kinds of

5    activities again, falling into these kinds of activities

6    again, and I credit much of what Mr. McGhee said about his

7    experience and how he got here, or how he got to

8    Martha's Vineyard.

9            And, then, I turn to the question of rehabilitation

10   through the prison system, the penological considerations, and

11   I do think that this is a circumstance in which Mr. McGhee

12   will be benefited from time in the federal system, which has

13   available programs for him that will serve various aspects of

14   his needs, drug programs, mental health programs, and

15   vocational programs.

16           The drug program that is of concern to me is the

17   500 Hour program, and, so, starting with 120 months, there is

18   another limitation period for me, and that is:  I do not want

19   the sentence to be reduced so much that he will not be able to

20   take advantage of those programs or will be barred in some

21   fashion from those programs.

22           I do view the time served solely as a result of

23   being held in custody for the Murder case to be something that

24   I should reflect in the sentence, and I do so because, not to

25   put too harsh a characterization on it, a wink is as good as a

1    nod to a blind horse.

2            It's time spent in prison for his previous

3    activities or for his criminal activities that should not have

4    been spent there, at all, but he feels the same way; in fact,

5    he feels worse, because there's never been an adjudication,

6    and it seems to me that that's properly folded into this 120

7    months, but I'll get more precise figures, recognizing that

8    precision is not what I'm looking for here, it is order of

9    magnitude.

10           The final thing for me here, and this is not

11   obviously the final sentence, because I can't reduce it to

12   figures, the final thing for me, Mr. McGhee, is this:  There

13   are lots of studies that show that young men, and I'll say men

14   before they're 35, who get themselves in trouble, recidivate,

15   do it again, with more frequency, than people who are older

16   than 35.

17           They become more mature, they have other aspects of

18   their life that become more salient, and that is in the back

19   of my mind.

20           The sentence that I'm anticipating here is not

21   going to take you to 35, I don't believe, but it's going to

22   take you a period of time with support that will permit you to

23   come to grips with a whole series of things that you haven't

24   come to grips with yet, if you respond to the program, and you

25   can blow it away, but that doesn't help you.

1    There will, of course, be a period of Supervised

2  Release; and I'll give the maximum period of Supervised

3  Release, again, to make sure that your reintroduction into the

4  community doesn't get you jammed up the way your last one did,

5  but that's the architecture, that's the structure of the

6  sentence that I have in mind here.

7    I need more precise information, not because I'm

8  looking for precision, but to make sure I haven't missed the

9  order of magnitude that I should have reflected here.

10    Ordinarily, people don't get any benefit from time

11  served.

12    I actually pulled out a case I wrote fifteen years

13  ago, called <u>OSES versus the United States</u>, it's

14  833 F.Supp. 49, in which I talk about the entitlement to time

15  served, in the context of <u>habeas corpus</u>, the outcome of which

16  is that you lose it, and that's a formal response,But, here, I

17  believe I can tailor the sentence to make it reasonable, and

18  reasonable consists of a consideration of all of the past

19  factors here that are brought to my attention and proven,So I

20  guess I will wait to see an addendum.

21    I want a response to the addendum.

22    You'll help Probation out as best you can in

23  advance, but a response to the addendum within five days of

24  its receipt, and, then, we'll be back here to impose the

25  sentence in this case.

1          MS. FRIED:  Will this be E-mailed to counsel?

2          Is that what we should expect or a phone call?

3          THE COURT:  How do you think you're going to

4     distribute it?

5          U. S. PROBATION OFFICER PAIVA:  Well, first of all,

6     would -- Your Honor, the parties to respond to the addendum?

7          THE COURT:  Mm-hmm.

8          I want you to get your best shot at it, including

9     they're going to help you out, or they better, at the risk of

10    having waived their right to make a meaningful objection.

11         U. S. PROBATION OFFICER PAIVA:  Okay.

12         THE COURT:  So they'll help you out by bringing to

13    your attention these matters.

14         U. S. PROBATION OFFICER PAIVA:  And does Your Honor

15    also want me to amend the report to include the Career

16    Offender Guidelines --

17         THE COURT:  Yes.

18         U. S. PROBATION OFFICER PAIVA:  -- as you

19    previously stated?

20         THE COURT:  Yes, so there will be a new -- a

21    revised PSR that reflects the Career Offender Guidelines that

22    I've determined in this case.

23         MS. FRIED:  Would it be appropriate for me, to

24    simply, to also, in light that there's going to be a revised

25    Guideline, Your Honor, just to formalize my objection in

1 | writing to the recalculated Guideline range?

2 | THE COURT:  The horse is outside of the barn at

3 | this point, and I've listened to your objection, and I've

4 | ruled on it.  Your objection is fairly reflected in the record

5 | of the case.

6 | MS. FRIED:  Alright.

7 | THE COURT:  I don't think you have to go through

8 | that exercise.  I don't believe you have to go through that

9 | exercise.

10 | I've been apprized, I think, of what I need to know

11 | about it.

12 | From you, I would have preferred it in writing,

13 | that's all, as I've indicated in the past on this, so that's

14 | where we're going to go, Mr. McGhee.

15 | You've got some -- more than some idea of what I

16 | think about the sentence in this case.

17 | I don't expect you to embrace it, but you're

18 | entitled to know how I'm thinking about it and the reasons

19 | that I've entered it in contemplating this outcome, and the

20 | reasons are tailored to you, not, you know, that I do the bean

21 | counting that the Guidelines indicated.

22 | They're tailored to you, and my perception of you

23 | as a man, in light of the considerations of the statute, which

24 | tells me what the factors are that I should consider, and it's

25 | not just you've done the crime, you do the time.

1          It is:  Try to reflect it in light of various other

2 factors here.

3          As I said, you don't have to agree -- agree with

4 me, or not.

5          That's really up to you, but one thing you do have

6 to do, is, when this sentence is imposed, you've got to apply

7 yourself.

8          I credit the stuff in the Presentence Report of you

9 trying to get programs, trying to do something with yourself.

10 That's how you're going to be successful under this.

11          If, as I say, you blow it away, it's not just the

12 sentence you're blowing away.

13          It's your life, so we'll continue this process

14 until I get what I think is the right sentence here, alright?

15          We'll be in recess.

16          THE DEPUTY CLERK:  All rise.

17                    -   -   -

18          (The proceedings were concluded.)

19                    -   -   -

20

21

22

23

24

25

1                        I N D E X

2

3                                              PAGE

Hearing                                          3

4

5

6                        -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X
(CONTINUED)

E X H I B I T S

(NO EXHIBITS WERE MARKED.)

- - -

# C E R T I F I C A T I O N

I, DIANE M. MOLAS, a Registered Professional Reporter (RPR), a Certified Shorthand Reporter (CSR) in the States of Delaware and Massachusetts, a Certified Court Reporter (CCR) in the State of New Jersey, and a Notary Public in the Commonwealth of Pennsylvania, do hereby certify that the foregoing is a true and accurate transcript of the proceedings reported by me, on November 18, 2008, and that I am neither counsel, nor kin, to any party or participant in said action, nor am I interested in the outcome thereof.

_____

Diane M. Molas, RPR, DE & MA CSRs, and NJ CCR
DE Certification Number 208-RPR
MA Certification Number 149208
NJ Certification Number 30XI00228400

-   -   -

*(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the DIRECT CONTROL AND/OR SUPERVISION of the Certifying Court Reporter herself.  THE COURT REPORTER'S CERTIFICATION NEVER APPEARS AS A PHOTOCOPIED SIGNATURE.)*

-   -   -